**IT IS SO ORDERED.**

**Dated:  04:59 PM May 01 2009**

MARILYN SHEA-STONUM  *JZ*
U.S. Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CASE NO. 07-51027 |
| | ) | |
| Marlynn R. O'Neal, | ) | CHAPTER 13 |
| | ) | |
| DEBTOR. | ) | |
| | ) | |
| Daniel M. McDermott, United States Trustee for Region 9, | ) | ADVERSARY NO. 08-5031 |
| | ) | |
| | ) | JUDGE MARILYN SHEA-STONUM |
| PLAINTIFF, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| Countrywide Home Loans, | ) | **MEMORANDUM OPINION** |
| | ) | |
| DEFENDANT. | ) | |

This proceeding is before the Court on the complaint of the United States Trustee

alleging that Countrywide Home Loans[1] engaged in conduct that abused the judicial process.

---

[1]     Bank of America recently acquired Countrywide Financial. On April 28, 2009, I
heard on national news that Bank of America Corp. planned to retire the
"Countrywide" name.  According to the news report, the "Countrywide"
operations will be combined with the bank's mortgage operations and will be

The United States Trustee requests that this Court enter an order pursuant to 11 U.S.C. § 105(a) and Local Bankruptcy Rule 2090-2 imposing monetary sanctions against Countrywide and enjoining Countrywide from engaging in bad faith and abusive practices in connection with its preparation, verification, filing and prosecution of pleadings and proofs of claim in bankruptcy cases.

The Court held a trial in this proceeding on April 24, 2009. Appearing at the trial were Dean Wyman and Paul Randel, counsel for the United States Trustee, and Thomas Connop, Robert Folland and Jeremy Campana, counsel for Countrywide. During the trial the parties presented evidence in the form of exhibits and testimony from John Smith, Ted McClatchey, Jacob Wilhite, Donald Gaines, Ryan Kay, Jerry Edmunds, and Robert Whittington.

In addition, prior to the trial, counsel filed a list of facts which they agree are not in dispute [docket # 68] (the "Stipulations"). At the conclusion of trial, counsel agreed to the admission of Countrywide Exhibits A-Q, T, W-AA, and CC-AAA, and UST Exhibits 1-30. The Court admitted UST Exhibit 31 over the objection of Countrywide's counsel.

JURISDICTION

This proceeding arises in a case referred to this Court by General Order No. 84 entered in this district on July 16, 1984. It is determined to be a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (B) and (O) over which this Court has jurisdiction pursuant to 28 U.S.C. § 1334.

---

known by the name "Bank of America Home Loans."

-2-

FINDINGS OF FACT

1.     On or about May 8, 2004, Marlynn R. O'Neal executed a mortgage (the "Mortgage") in favor of Ameriquest Mortgage Company in the amount of $69,300.00. The Mortgage was filed with the Summit County Fiscal Officer on or about May 18, 2004, under recording number 55049953. The real estate subject to this mortgage is located at 327 Ira Avenue, Akron, Ohio and is referred to herein as the "Property". *See* Stipulations.

2.     On or about May 8, 2004, Marlynn R. O'Neal executed a "Fixed Rate Note" (the "Note") in favor of Ameriquest Mortgage Company in the amount of $69,300.00. *See* Stipulations.

3.     Under a "Pooling and Servicing Agreement" dated as of September 1, 2004, between Park Place Securities, Inc., Depositor; Countrywide Home Loans Servicing LP, Master Servicer; and Wells Fargo Bank, N.A., Trustee, Countrywide Home Loans Servicing, LP agreed to service loans in accordance with the terms of the respective mortgage loans. Article III, Section 3.01, p. 72. *See* Stipulations.

4.     Countrywide Home Loans and/or Countrywide Home Loans Servicing, LP serviced Ms. O'Neal's loan evidenced by the Note and Mortgage. *See* Stipulations.

5.     On or about April 7, 2005, a "Complaint for Money, Foreclosure, and Other Equitable Relief" was filed in the Court of Common Pleas of Summit County, Ohio (the "Foreclosure Action"). The plaintiff in the Foreclosure Action was "Wells Fargo Bank, N.A. For The Benefit of the Certificateholders of Asset-Backed Pass-Through Certificates, Series 2004-MCW1 c/o Countrywide Home Loans, Inc. 6400 Legacy

-3-

Drive Plano Tx. 75024." The defendants were Marlynn R. O'Neal aka Marilynn Renee O'Neal and "Unknown Spouse, if Any, of Marlynn R. O'Neal aka Marilynn Renee O'Neal." The plaintiff was represented by the law firm of Maguire & Schneider, L.L.P. ("M&S") through attorneys Jerry L. Kaltenbach and Manbir S. Sandhu. *See* Stipulations.

6. In the Foreclosure Action, the plaintiff sought to foreclose upon the Property. *See* Stipulations.

7. In response to an unsolicited mailing from Faith Financial Group of Ohio, LLC ("Faith Financial") promising help to homeowners facing foreclosure, Ms. O'Neal contacted Jacob Wilhite ("Mr. Wilhite"), one of the owners of Faith Financial. Faith Financial had obtained Ms. O'Neal's address from the files of the state court in which the Foreclosure Action was filed.

8. Mr. Wilhite follows the real estate investing system taught in seminars given by Louis Brown of Georgia. Mr. Wilhite established Faith Financial to implement the techniques he learned after attending one of those seminars.

9. Under the guise of helping her, Mr. Wilhite talked Ms. O'Neal into giving him authority to contact Countrywide on her behalf. *See* Countrywide Exhibit DD. Mr. Wilhite testified that from the outset his goal was to get Countrywide to accept a short sale and then sell the property to a third party for more.

10. At some point, Mr. Wilhite offered the Property for sale at a meeting of the Akron Canton Real Estate Investment Association. Mr. Edmonds, Jr. approached Mr. Wilhite and said he had a buyer for the Property.

-4-

11.   On July 13, 2005, Mr. Wilhite, on his own behalf, tendered a proposal to Countrywide, offering to purchase the Property from Marlynn O'Neal for an aggregate purchase price of $5,000.00, subject to satisfaction of the Mortgage. *See* Countrywide Exhibit WW.

12.   On or about August 17, 2005, Countrywide countered Mr. Wilhite's short payoff offer requesting a minimum payoff amount of $13,000.00. *See* Countrywide Exhibit YY.

13.   Mr. Wilhite tendered a Standard Real Estate Purchase and Sale Agreement to Countrywide, representing he was the Buyer for the Property and Marlynn O'Neal was the Seller, for a total purchase price of $13,000.00.

14.   On September 13, 2005, Countrywide approved the short payoff offer submitted by Mr. Wilhite to satisfy Marlynn O'Neal's loan for $13,000.00. *See* Countrywide Exhibit YY pg. 11.  Mr. Smith testified that in some circumstances, Countrywide, as a servicer, does not have authority to accept short sales.  However, in this case, he testified Countrywide had "delegated authority" from its investor, Wells Fargo,[2] to negotiate and accept a short sale.

15.   Mr. Wilhite represented to Countrywide that the closing of this short payoff sale would occur on or about October 13, 2005.

16.   In the meantime, Mr. Wilhite caused the Debtor to sign additional documents.

---

[2]   Mr. Smith continually referred to Wells Fargo as its "investor."  The Court believes the relationship between Wells Fargo and Countrywide is described better as a customer relationship:  Countrywide provided services to its customer Wells Fargo and Wells Fargo acted as trustee for the ultimate holders of the mortgagee's rights under the Mortgage and Note.

-5-

Debtor, as "Beneficiary", and Faith Financial as "Trustee of the 327 Ira Ave Residential Land Trust" signed a "Land Trust Agreement" prepared by Mr. Wilhite. *See* Stipulations. In addition, the Debtor executed and delivered to Faith Financial an "Assignment of Beneficial Interest in Land Trust", prepared by Mr. Wilhite, conveying all her "rights, powers, privileges, and beneficial interest" under the Land Trust Agreement to Faith Financial. *See* Stipulations. The Debtor also executed a "Standard Warranty Deed" purporting to transfer the Property to the "327 Ira Ave Residential Land Trust, Faith Financial Group of Ohio LLC as Trustee." The Standard Warranty Deed recited it was supported by consideration in "the sum of Ten Dollars ($10.00) and other valuable consideration." The Court doubts, based on Mr. Wilhite's testimony, that that any consideration was actually tendered to the Debtor by either "327 Ira Ave Residential Land Trust," Faith Financial, or Mr. Wilhite.

17. The purported conveyance of the Property by the Debtor to "327 Ira Ave Residential Land Trust" was not disclosed to Countrywide by Marlynn O'Neal, Faith Financial, or Mr. Wilhite. This deed was recorded on or about September 19, 2005, with the Summit County Fiscal Officer under recording number 55235443.

18. On September 19, 2005, Mr. Wilhite, as "Agent of Faith Financial Group of Ohio, LLC as Trustee" caused to be filed with the Summit County Fiscal Officer, under recording number 95157756, a "Statement of Reason for Exemption from Real Property Conveyance Fee" regarding the transaction referenced in the September 14, 2005 Standard Warranty Deed. *See* Stipulations. According to the "Statement of Reason for Exemption from Real Property Conveyance Fee," the purported

-6-

conveyance of the Property to "Faith Financial as Trustee" was represented to be "exempt from the fees required by division (F)(3) section 319.54 of the Revised Code of Ohio, for the reason checked below." The reason checked by Mr. Wilhite was because the transfer was: "to a trustee of a trust, when the grantor of the trust has reserved an unlimited power to revoke the trust." Other than its filing in the public records, the "Statement of Reason for Exemption from Real Property Conveyance Fee" was not disclosed to Countrywide by Marlynn O'Neal, Faith Financial, or Mr. Wilhite.

19. On or about October 11, 2005, Marlynn R. O'Neal executed a "Warranty Deed" in which deed the grantor is listed as the "327 Ira Avenue Land Trust, Faith Financial Group of Ohio, LLC, Trustee" and the grantee is identified as "Donald Gaines." The real estate subject to this deed is located at 327 Ira Avenue, Akron, Ohio. The deed was recorded with the Summit County Fiscal Officer on or about February 6, 2006 under recording number 52285575. Mr. Gaines paid $70,000.00 for the transfer of this real estate. *See* Stipulations.

20. The fact Donald Gaines was the purchaser of the Property was not disclosed to Countrywide prior to closing by Marlynn O'Neal, Faith Financial, or Mr. Wilhite.

21. On or about October 11, 2005, Bankers Title & Escrow Agency, Inc. ("Bankers Title"), as Settlement Agent, received $70,006.19 in deposits for the conveyance of the Property to Donald Gaines. Jared Pauley was the agent from Bankers Title responsible for this transaction. Bankers Title distributed the proceeds from the sale as set forth on Countrywide Exhibit JJ.

-7-

22. Based on Mr. Wilhite's remark that "If Ms. O'Neal was in foreclosure and she was losing the property anyways, why would she want any money from it?" the Court believes that Ms. O'Neal did not receive any of the proceeds from the sale.

23. In contrast, Faith Financial received $15,000. Countrywide Exhibit II. Easy Home Construction, a company owned by Mr. Edmonds, received $33,333.01. Countrywide Exhibit NN. Easy Home Construction did not perform $33,000 worth of work on the Property. Bankers Title received $5,037.50. Countrywide Exhibits MM and OO.

24. Countrywide received $13,000 from the sale of the Property. *See* Countrywide Exhibit JJ. Bankers Title did not request a lien release from Countrywide. At the conclusion of its "claims process," Countrywide paid $5,700 of these proceeds to Wells Fargo and retained the balance for fees that it claimed under the Servicing Agreement.

25. Countrywide's files contain two copies, sent to it by facsimile, of what purport to be HUD-1 Statements showing a contract sale price for the Property of $13,000 and not listing any of the settlement amounts disbursed by Bankers Title. The last page of these documents bear the signatures of Marlynn O'Neal and Donald Gaines. Based on the testimony of Donald Gaines, the Court doubts whether the first two pages, as they appear in Countrywide's files, were attached to the third page at the time it was signed. *See* Countrywide Exhibits UU and VV.

26. Presumably the original HUD-1 Statements would be contained in Bankers Title's closing file. However, the closing file at Bankers Title pertaining to this matter is missing. Mr. Kay testified that the records of Bankers Title reflect the existence of a closing file, but a notation in the records shows possession of the file was given to

-8-

"Madelyn O'Neal for copies."

27.     On or about October 28, 2005, Kevin Kilker at Countrywide Home Loans, Inc.
acknowledged receipt of the payoff amount in the amount of $13,000.00, and sent a
closing note to Countrywide Home Loans, Inc. personnel. The workout status on
Countrywide Home Loans, Inc.'s records was also changed to closed. UST Exhibit
15, "CHL-ONEAL 001186."   Mr. Kilker further instructed Deanna to "issue a
reconveyance on this short sale" and he instructed Kristin to "update the borrower's
credit report." UST Exhibit 16, "CHL-ONEAL 001482." Countrywide Home Loans,
Inc. did not cause any notation to be made on the Note showing that it had been paid
in full. UST Exhibit 2.

28.     On January 18, 2006, a "Notice of Dismissal" was filed in the Foreclosure Action.
M&S through attorney Manbir S. Sandhu filed this notice. *See* Stipulations.

29.     Following Countrywide's acceptance of the short sale funds, Ms. O'Neal's loan
account was not properly coded to indicate within Countrywide's records that the loan
was inactive.  Countrywide continued to send statements to Ms. O'Neal, to cause
forced placed insurance to be in place, purportedly had the lawn mowed, and
purportedly did drive by inspections of the property even after accepting the short
sale.

30.     Mr. Smith testified that "Lock Out Code 3" was assigned to Ms. O'Neal's loan
account signifying a property has been foreclosed upon or conveyed to a third party.
However, the account remained active on Countrywide's system because the "claims
process" between Countrywide and Wells Fargo had not been completed.

-9-

31.     Ms. O'Neal contacted Countrywide many times following its acceptance of the short

sale to inquire why she was continuing to get bills from Countrywide. Countrywide's

AS 400 system reflects these inquiries. *See, e.g.,* UST Exhibit 17.

32.     In response to the inquiry from Ms. O'Neal on April 24, 2006, Samuel Cooper of

Countrywide Home Loans, Inc. sent an e-mail to Pedro Elizalde and Kristin Bradley

of Countrywide Home Loans, Inc. in which he stated:

"Hello, H/O [homeowner] called in wanted to know why she is still getting bills for
mort payments. Loan notes showed we recvd funds for approved SPO but
loan is still opened on the books. Can one of you look into this?"

UST Exhibit 18, "CHL-ONEAL 001622"

33.     On April 24, 2006, Kristin Bradley of Countywide Home Loans, Inc. sent an e-mail

to Kevin Kilker, with a copy to Samuel Cooper and Pedro Elizalde under the caption

in part: "Loan . . . SPO Sale Loan still open" in which she stated:

"This shortsale was completed back in October 05 but the homeowner is still
receiving bills for mortgage payments. Do you know if there is a way to fix
this? Please let me know as soon as possible.

UST Exhibit 19, "CHL-ONEAL 001623"

34.     On April 24, 2006, Kevin Kilker of Countywide Home Loans, Inc. sent an e-mail to

Sarah Galvan of Countrywide Home Loans, Inc. under the caption: "Fw Loan . . . .

SPO Sale Loan still open," in which he stated:

"Sarah. Do you know how to prevent this?

UST Exhibit 20, "CHL-ONEAL 001624"

35.     On April 28, 2006, Kristin Bradley of Countrywide Home Loans, Inc., reviewed the

O'Neal loan and noted "fees due still pending. will f/u [follow up]." Plaintiff UST

-10-

Exhibit 22 , "CHL-ONEAL 001265."

36.     On August 29, 2006, Ms. O'Neal telephoned Countrywide Home Loans, Inc. She

spoke to Porshi Jones. The notes of this call reflect:

Mrs. states her loan should be paid off. States she completed a
short sale. Notes show the last pay off demand was in Feb. At this
time chl does not show funds received for the payoff. Called Jacob on
3 way at 330-310-4310. states we should speak with Jarod from
Banker Title & Trust at 216-421-9999. left a message for mr to
call back mrs and 3 way me. Gave my contact info.

UST Exhibit 23. "CHL-ONEAL 001271.

37.     On September 9, 2006, Ms. O'Neal had a telephone conversation with Jarrett Silva

of Countrywide Home Loans, Inc. The notes of this call state:

"H/O STATED THAT SHE SOLD THE H/O BACK ON OCT 14, 2005 . . .
STATED THAT SHE IS CURRENTLY HAVING THE PAPER WORK SENT
TO CHL TO HAVE MATTER CLEARED UP . . .

UST Exhibit 24, "CHL-ONEAL 001275."

38.     On November 12, 2006, Ms. O'Neal had a telephone conversation with Casey Ford

of Countrywide Home Loans, Inc. The notes of this call state:

"mrs std she has sold this prop a while ago, infrmd I don't see we rcvd pyoff, std
she alrdy workd this out with someone, std she spoke with someone here with
the title co on 3 way a while ago and they resolvd, infrmd I don't see it has been
rslvd, per those notes the person from the title co was supposed to cll bck with
info on the pyoof and we never rcvd a cll bck, infrmd she needs to get info
togthr from pyoff so we can rsrch bcaus it is affctng her crdt, mrs std she
would see wat she can do . . ."

UST Exhibit 25, "CHL-ONEAL 001282."

39.     On November 14, 2006, Ms. O'Neal had a telephone conversation with Porshi Jones

of Countrywide Home Loans, Inc. The notes of this call state:

-11-

"mrs. called to verify the property has been sold and paid off with chl. Advised at this time the loan is still showing active. Jacob never called back with the wiring information to show the loan paid off. Called on 3 way office is not open. Mrs. will call back as soon as the office opens left message for Mr to call me back."

UST Exhibit 26, "CHL-ONEAL 001283."

40.     On December 6, 2006, Ms. O'Neal had a telephone conversation with Porshi Jones

at Countrywide Home Loans, Inc. The notes of this call state:

"States this loan was paid off 10/14/2005. Sending the proof of bank wire and the loa. Sent lotus note to S. Galvan to get a status update."

UST Exhibit 27, "CHL-ONEAL 001287."

41.     On December 11, 2006, Kristin Bradley sent an e-mail to Sarah Galvan, with copies

to Jomo Kenyatta, Peter Otero and Porshi Jones under the caption "Re . . . Short Sale,

O'Neal, P. Otero" in which she stated:

I updated everything to reflect as a shortsale, I'm just waiting for investor reimbursement for supplemental fees. Hopefully it will be fully closed out by the end of the year.

UST Exhibit 28, "CHL-ONEAL 001626, 001627, and 001628.

42.     On December 11, 2006, Ms. O'Neal had a telephone conversation with Porshi Jones

at Countrywide Home Loans, Inc. The notes of this call state:

"Called Mrs advised the short sale was completed in 10/2005. Advised waiting for investor information before the loan could be closed. It should be closed out by the end of the year. Advised will submit credit correction from October 2005-to 12/2006. Attempted to submit credit correction, System shows not reported. will no change status."

UST Exhibit 29, "CHL-ONEAL001288."

43.     On February 8, 2007, Wendy Scharf of Countrywide Home Loans, Inc. noted in the

Countrywide system that she had "reviewed loan, suppl funds still pending." UST Exhibit 30, "CHL-ONEAL 001299."

44.    Notwithstanding these repeated inquiries, Countrywide did not properly correct its records to show that Countrywide had accepted $13,000 in full satisfaction of Ms. O'Neal's loan.

45.    Ultimately, the claim process concluded resulting in over $7,000 in fees being attributed to Countrywide and less than $6,000 of the $13,000 payment being attributed to Wells Fargo.

46.    On or about April 10, 2007, Marlynn R. O'Neal filed a voluntary petition for relief under chapter 13 of the Bankruptcy Code with the United States Bankruptcy Court for the Northern District of Ohio. She was represented by Robert M. Whittington, Jr. Under the fee agreement between Mr. Whittington and the Debtor, the Debtor promised to pay $2,000 through her plan for basic bankruptcy services.

47.    Along with the petition, Ms. O'Neal also filed schedules and a statement of financial affairs. Ms. O'Neal did not identify owning any real estate in "Schedule A" because at the time she filed her bankruptcy case, she did not hold record title to the Property. In her "Statement of Financial Affairs, Ms. O'Neal identified a transfer on September 15, 2005 of real estate located at 327 Ira Avenue, Akron, Ohio to the "Faith Financial Trust dba 327 Ira Ave. Residential Land Trust." Statement of Financial Affairs, response to question number 10(a). Ms. O'Neal did not list any other transfers in her "Statement of Financial Affairs."

48.    Ms. O'Neal appropriately did not schedule Countrywide Home Loans Inc.,

-13-

Ameriquest Mortgage Company or Wells Fargo Bank as creditors.

49. Although not listed as a creditor, Countrywide somehow became aware of the Debtor's bankruptcy case. Notwithstanding the acceptance of a short sale and the alleged designation of Ms. O'Neal's loan account as "Lockout Code 3," and the numerous entries in the loan history kept by Countrywide revealing that Ms. O'Neal's loan account was only open because the "claims process" was incomplete, a "bankruptcy technician" at Countrywide referred Ms. O'Neal loan account to M&S for the purpose of representing Countrywide in Ms. O'Neal's bankruptcy case.

50. Although all of the details of the arrangement were not provided to the Court, generally Countrywide and M&S had an arrangement whereby emails would be sent to M&S identifying new matters. Instructions for the scope of the representation with respect to the matter would be contained in the email and documents deemed by Countrywide to be relevant to the representation would be made available on a business partner web site. The documents made available by Countrywide are automatically uploaded to the website upon initiation of the referral. Apparently under Countrywide's standard operating procedures, no Countrywide employee is expected to review the documents or the file to determine whether the documents being made available are sufficient or accurate.[3] The attorneys to whom the matters

---

[3] Mr. Smith testified that the placement of Lock Out Code 3 on Ms. O'Neal's loan account should have resulted in the bankruptcy technician reviewing the file and escalating it to management for further review. In this case, however, as seems consistent with Countrywide's inability to correctly follow its internal operating procedures with respect to Ms. O'Neal's loan account, the bankruptcy technician purportedly did not review the file or escalate it to management. Instead, the

-14-

are referred don't have access to any other documents through the website.

51.     In this case, Ms. O'Neal's loan account was referred to M&S by email instructing M&S to file a proof of claim and objection to confirmation on behalf of Countrywide, as servicer. The Mortgage and Note were made available to M&S on the business partner web site. The loan history, including the notes captured by Countrywide's AS 400 system, were not.

52.     On May 1, 2007, a Proof of Claim was filed in Ms. O'Neal's bankruptcy case on behalf of Wells Fargo Bank, N.A. by Ted P. McClatchey, Esq., then an associate with the law firm of M&S. At the time he filed the Proof of Claim Mr. McClatchey had not reviewed the foreclosure file in his law firm. He only reviewed those documents made available on the business partner web site.

53.     The Proof of Claim form indicates that the name and address where notices should be sent is:

> Wells Fargo Bank, N.A.
> c/o Countrywide Home Loans, Inc.
> 7105 Corporate Drive, PTX B-209
> Plano, TX 75024

The "Proof of Claim" states that the amount of $88,859.06 was due at the time the case was filed and that the amount of $88,859.06 represented a secured claim. The collateral purportedly securing the claim was described as the Property and the "Proof of Claim" states that there was a pre-petition arrearage in the amount of $19,474.30. The Proof of Claim further stated in paragraph 6 that "The amount of all payments on

_____

bankruptcy technician referred the matter directly to an attorney.

-15-

this claim has been credited and deducted for the purpose of making this proof of claim." UST Exhibit 8-1.

54.  Exhibit A to the "Proof of Claim" consists of a "Proof of Claim Calculation." This attachment alleges that the principal balance owed was in the amount of $69,111.76 and that there were 28 payments in the amount of $696.55 each, for an arrearage of $19,503.40. This exhibit alleges that the total amount due is $88,859.06.  UST Exhibit 8-2.

55.  A copy of the Note was attached to the Proof of Claim.

56.  A copy of the Mortgage was also attached to the Proof of Claim.

57.  No assignment or other evidence of transfer of the Note and Mortgage from Ameriquest Mortgage Company was attached to the Proof of Claim.

58.  Ted P. McClatchey also filed an "Objection To Confirmation of Chapter 13 Plan" (the "Objection to Confirmation") on behalf of Countrywide Home Loans, Inc. UST Exhibit 9.  The Objection to Confirmation asserts that the Debtor's plan fails to properly provide for its secured claim.

59.  The debtor, through her attorney Robert M. Whittington, Jr. filed a response to the Objection to Confirmation and an "Objection To Allowance of Claim" (the "Claim Objection"). UST Exhibit 10 and 11, respectively.  The debtor stated that she conveyed the Property on September 14, 2005 and that Countrywide Home Loans, Inc. "accepted a short-sale payment of $13,000.00 in satisfaction of its interest" in the Property and that Countrywide Home Loans, Inc. was paid out of escrow from the sale.

-16-

60.     On June 6, 2007, the Court entered an "Order Sustaining Objection to Allowance of

        Claim." Doc. 27.  On June 6, 2007, Countrywide Home Loans, Inc. withdrew the

        Objection to Confirmation. Doc. 28

61.     On June 18, 2007, the Court confirmed debtor's plan. Doc. 30

62.     In March 2008, Ms. O'Neal passed away.

63.     It was not until July 25, 2008 that an assignment was filed with the Summit County

        recorder's office showing an assignment from "Ameriquest Mortgage Company" to

        "Wells Fargo Bank N.A. For The Benefit of Certificate Holders of Asset-Backed."

        The recording number for this document is 55560031.  This assignment is dated June

        30, 2008.  The mortgage that is the subject of this assignment is the mortgage in favor

        of Ameriquest Mortgage Company executed by the debtor on or about May 8, 2004.

         This assignment includes the provision that the mortgage is assigned:

        Together with the Note or Notes therein described or referred to,
        the money due or to become due thereon with interest, and all
        rights accrued or to accrue under said Mortgage.

        UST Exhibit 31.

DISCUSSION

        The findings of fact in this case plainly give rise to many additional questions and

issues, only some of which are germane to the dispute pending before this Court.  The dispute

before the Court centers around the acts of Countrywide that ultimately resulted in the filing

of a proof of claim and objection to confirmation in Ms. O'Neal's bankruptcy case that had

no basis in fact.

        The UST argues that Countrywide Home Loans, Inc. was reckless and acted in bad

-17-

faith in this case. He points to (1) the filing of a Proof of Claim and Objection To Confirmation of Plan when Countrywide knew that it had accepted a short-sale payoff from Ms. O'Neal in October, 2005; (2) the filing of the Proof of Claim and Objection To Confirmation even though Ms. O'Neal had telephoned Countrywide Home Loan, Inc. repeatedly in 2006 to complain of ongoing receipt of statements showing a growing delinquency after that short sale closing; (3) the filing of the "Proof of Claim and Objection To Confirmation of Plan on behalf of Wells Fargo, N.A. when there had been no assignment of mortgage filed with the Summit County Fiscal Officer of the Mortgage from Ameriquest Mortgage Company to Wells Fargo Bank, N.A. Trustee Wells Fargo Bank, N.A., under that certain Servicing Agreement relating to Park Place Securities, Inc., 2004-MCW1 Asset Back Pass Through Certificates, Series 2004-MCW1 prior to the filing of the Proof of Claim and Objection To Confirmation were filed by Countrywide Home Loans, Inc.; (4) the incorrect statement made by Countrywide Home Loans, Inc. in the Proof of Claim when it stated that all credits had been deducted from the amount it said was owed; and (5) the filing of the satisfaction of Ms. O'Neal's mortgage on or about July 25, 2008 when Countrywide Home Loans, Inc. had accepted the short- sale payoff in October, 2005. Countrywide denies that these acts are evidence of reckless, intentional or bad faith behavior. In addition, Countrywide denies a systemic problem. Countrywide suggests that at most is was negligent and that its errors are off set by Ms. O'Neal's involvement with Faith Financial.

It is undisputed that the Court has inherent authority to sanction a party. *Red Carpet Studios Division of Source Advantage v. Sater*, 465 F. 3d 642, 645 (6th Cir. 2006), *reh'g denied* January 17, 2007; *In re Workman*, 392 B.R. 189, 194 (Bankr. D.S.C. 2007)(Court has

-18-

inherent authority to sanction party).

> Federal courts, including bankruptcy courts, have inherent and statutory authority to impose sanctions upon parties for their abuse of the litigation process. *See Rathbun v. Warren City Schools ( In re Ruben)*, 825 F.2d 977, 982-84 (6th Cir.1987). In particular, 28 U.S.C. § 1927 provides that "[a]ny attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." Likewise, Federal Rule of Bankruptcy Procedure 9011, which is modeled upon Federal Rule of Civil Procedure 11, authorizes a bankruptcy judge to impose sanctions upon an attorney who has filed a motion that was not grounded in fact or warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law.[fn omitted] *See* Fed. R. Bankr.P. 9011(b)-(c). The test for imposing such sanctions is "whether the individual's conduct was reasonable under the circumstances." *In re Downs*, 103 F.3d at 481; *see also Ruben*, 825 F.2d at 984 ("[T]he standard for section 1927 determinations in this circuit is an objective one, entirely different from determinations under the bad faith rule.... There must be some conduct on the part of the subject attorney that trial judges, applying the collective wisdom of their experience on the bench, could agree falls short of the obligations owed by a member of the bar to the court and which, as a result, causes additional expense to the opposing party."). In applying this test, the bankruptcy court should not rely on the benefit of hindsight, but rather should assess the party's conduct by what was reasonable to believe at the time the motion was submitted. *In re Downs*, 103 F.3d at 481 (quoting *McGhee v. Sanilac County*, 934 F.2d 89, 93 (6th Cir.1991)).

*Maloof v. Level Propane Gasses, Inc. (In re Level Propane Gasses, Inc.)*, 2008 WL 2952779 (6th Cir. July 30 2008); *see also Followell v. Mills, 2009 WL 723132* (6th Cir. March 18, 2009) ( finding bad faith is not a prerequisite to an award of sanction under either Rule 9011 or § 1927 and reckless conduct to be sufficient to support such an award). Rule 9011(c) provides the Court with the ability to sanction the party responsible for the Rule 9011(b) violation. Fed. R. Civ. P. 9011(c) ("If after notice and a reasonable opportunity to respond, the court determines that subdivision (b) has been violated, the court may ... impose an

-19-

appropriate sanction upon the attorneys, law firms, or parties that have violated subdivision

(b) or are responsible for the violation.")

> [C]ourts have utilized their inherent authority to prevent and sanction abuses of judicial power. *See In re Courtesy Inns, Ltd.*, 40 F.3d at 1090 (bankruptcy court had inherent authority to sanction debtor's president for bad faith filing of bankruptcy petition); *Engel v. Bresset ( In re Engel)*, 246 B.R. 784, 789-90 (Bankr.M.D.Pa.2000)(§ 105 authorizes bankruptcy court to exercise its inherent powers to sanction attorney's bad faith filing of inaccurate schedules); *First Fed. Sav. and Loan Ass'n of Largo v. Froid (In re Froid)*, 106 B.R. 293, 296 (Bankr.M.D.Fla.1989) (power to correct abusive practices acknowledged but no sanctions entered against creditor who filed and prosecuted discharge complaint); *Mortgage Mart, Inc. v. Rechnitzer ( In re C*hisum), 68 B.R. 471, 473 (9th Cir. BAP 1986) (recognizing power of bankruptcy court to impose sanctions on parties and counsel who willfully abuse the judicial process, but not finding sanctions appropriate against debtor and his attorney for their repeated bankruptcy filings).

*Kerney v. Capital One Financial Corp. (In re Sims)*, 278 B.R. 457, 481 (Bankr. E.D. Tenn. 2002) (finding a complaint alleging a creditor "knowingly and willingly" and "systematic[ally]" filed claims in excess of the amounts to which it was entitled in chapter 13 proceedings nationwide withstands motion to dismiss); *see also In re Kilgore*, 253 B.R. 179 (Bankr. D.S.C. 2000) (Court imposed sanctions under Fed. R. Bankr. P. 9011 and 11 U.S.C. § 105 upon mortgagee which Court noted was sophisticated creditor. The basis for the sanctions was inaccurate representations by creditor in support of motion for relief from stay); *In re Fagan*, 376 B.R. 81 (Bankr. S.D.N.Y. 2007)(Court imposed sanctions even though creditor withdrew motion for relief from stay).

The test for imposing such sanctions is "whether the individual's conduct was reasonable under the circumstances," or was reckless. *See In re Downs*, 103 F.3d at 481; *Ruben*, 825 F.2d at 984; and *Followell v. Mills,* 2009 WL 723132.  A party is reckless when it "knows, or has reason to know . . . of facts which create a high degree of risk of . . . harm

-20-

to another, and deliberately proceeds to act, or fail to act, in conscious disregard of, or indifference to, that risk." *Exxon Shipping Company v. Baker*, 128 S. Ct. 2605, 2622, 171 L. Ed. 2d 570, 76 U.S. 4603 (2008)(quoting with approval from 2 Restatement (Second) Torts, Section 550, Comment a, pp. 587-588). Countrywide's system is reckless. It appears to me designed to allow each actor in the process to act with indifference to the truth, and to rely solely on the limited information made available at each step. It is no defense that the actors in the process made mistakes, the system allows those mistakes to be hidden from the view of the next actor in the chain; thereby encouraging this type of error, or at a minimum, delaying the discovery of these errors. The errors in this case were plentiful, from the failure to properly account for the receipt of short sale funds to the failure to correctly identify the holder of the Note and Mortgage. They evidence Countrywide's disregard for diligence and accuracy. The cumulative impact of each of the errors in this case rises to the level of sanctionable conduct in this case.

Regular players in the system, like Countrywide, regardless of the name under which they do business, should be able to (and should be required to) maintain accurate records and provide their counsel with information capable of being relied upon. *See* 253 B.R. at 190-191 (The broad language of § 105, granting bankruptcy courts the power to prevent abuse of the judicial process, encompasses the court's authority to sanction a creditor for its misconduct in providing its attorney with incorrect information.). In the context of matters relating to the automatic stay, the bankruptcy court in the District of South Carolina sanctioned a creditor for failure to maintain and provide accurate information to counsel. *Id.*

> The court must expect that parties, especially sophisticated creditors, base
> such motions on a proper factual basis and at least accurately represent the

-21-

state of their own records. More and more frequently, in these days of national lenders and frequent assignments of notes and mortgages, this Court is confronted with creditors who file relief from stay motions asserting that debtors are in arrears when in fact, after a reasonable inquiry, it appears that they are current in their payments. Such a lack of diligence by the creditors is not only a problem for the Court and the debtors, who can not only least afford the additional costs in attorney's fees but whose reorganization in some cases is dependent upon the retention of the collateral which is the subject of such motions, but is also even a problem for the creditors' attorneys that file these motions. To effectively be able to prosecute these motions and represent the truth of the matter alleged, these attorneys must be able to rely upon their clients and the information provided to them.

*In re Asbill*, C/A No. 98-05819-W (Bankr.D.S.C.02/01/1999); aff'd C/A No. 3:99-0773-19 (D.S.C.02/23/2000).

With respect to Countrywide's argument that its errors are somehow off set by the actions of Ms. O'Neal in this case, the Court is entirely unpersuaded. There is no evidence in the record to support that Ms. O'Neal was other than a victim of a predator whose business operations are enabled by and depend upon a mortgage servicing industry that is unconcerned with the accuracy of records and information. Mr. Wilhite's testimony that the effect of his actions were of no consequence because Ms. O'Neal "was in foreclosure and she was going to lose the house anyways" underscores this point.

A reasonable investigation of Countrywide's records would have shown that Countrywide had no factual basis for asserting a claim in Ms. O'Neal's bankruptcy case or objecting to confirmation of her chapter 13 plan. Countrywide's conduct was not reasonable, was reckless and is sanctionable pursuant to § 105 and Rule 9011.

Having determined that Rule 9011 and § 105 have been violated, the next question for the Court is what are the appropriate sanctions for Countrywide's violations. Monetary sanctions may be appropriate, but the Court will also consider sanctions sufficient to deter

-22-

repetition of this conduct or comparable conduct by others, including how Countrywide can modify its internal practices to ensure the accuracy of its filings in future bankruptcy cases. Therefore, a trial with respect to the issue of sanctions shall be held on **May 11, 2009 at 9:30 a.m.** in the Bankruptcy Courtroom, Second Floor, U.S. Courthouse and Federal Building, 2 South Main Street, Akron, Ohio.

In addition, a telphonic pre-trial conference shall be held on **May 5, 2009 at 10:30 a.m.**

###

cc:    Thomas Connop
        Robert Folland
        Jeremy Campana
        Dean Wyman
        Paul Randel