**IT IS SO ORDERED.**

Dated:  03:07 PM July 31 2009

MARILYN SHEA-STONUM
U.S. Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CASE NO. 07-51027 |
| | ) | |
| Marlynn R. O'Neal, | ) | CHAPTER 13 |
| | ) | |
| DEBTOR. | ) | |
| | ) | |
| Daniel M. McDermott, United States | ) | ADVERSARY NO. 08-5031 |
| Trustee for Region 9, | ) | |
| | ) | JUDGE MARILYN SHEA-STONUM |
| PLAINTIFF, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| Countrywide Home Loans, Inc., | ) | **MEMORANDUM OPINION** |
| | ) | |
| DEFENDANT. | ) | |

In a prior Memorandum Opinion[1] entered on the docket of this adversary proceeding on May

---

[1] All capitalized terms (unless otherwise defined herein) shall have the meaning ascribed to them in the prior Memorandum Opinion.

1, 2009, this Court found that certain conduct of Countrywide Home Loans, Inc.[2] ("Countrywide") was not reasonable, was reckless and is sanctionable pursuant to § 105 and Federal Rule of Bankruptcy Procedure 9011. On May 11, 2009, the Court held a trial with respect to the issue of sanctions. Although monetary sanctions may have been appropriate, the UST did not ask for them. Therefore, the focus is on sanctions "sufficient to deter repetition of such conduct or comparable conduct by others similarly situated," including how Countrywide can modify and improve internal practices to ensure the accuracy of filings in future bankruptcy cases. *See* Fed. R. Bankr. P. 9011(c)(2).

Such improvement is necessary not just in light of what happened in Ms. O'Neal's bankruptcy case, but because of the sloppy participation of Countrywide in many chapter 13 cases across the country. As the Court noted during the trial, the problems created by the mortgage servicing industry have been pervasive in many of the cases on this Court's docket and have been the subject of respected empirical studies. The UST cited to the "Mortgage Study"[3] and specifically

---

[2]     On May 8, 2009, the parties to this litigation filed the following stipulation:

Countrywide Home Loans, Inc. is a wholly owned subsidiary of Countrywide Financial Corporation. Countrywide Financial Corporation is a wholly owned subsidiary of Bank of America Corporation. On April 27, 2009, Countrywide Home Loans Servicing, LP, a subsidiary of Bank of America, N.A., changed its name to BAC Home Loans Servicing, L.P. Countrywide Home Loans, Inc., has transferred the servicing rights to loans it previously serviced or it has contracted with BAC Home Loans Servicing, LP to subservice those loans on its behalf.

The United States Trustee ("UST") asks the Court to impose sanctions upon Countrywide and its successors and/or assigns. The defendant presented no evidence to support any other result.

[3]     The Mortgage Study, led primarily by Tara Twomey and Katherine Porter, is a multistate study designed to facilitate research on the intersection of mortgage

-2-

to the field data analyzed most recently by one of the most deservedly respected scholars working to shed light on bankruptcy practices across the country. In the article cited by the UST, that scholar notes

> [M]ortgage companies frequently do not comply with bankruptcy law. A majority of mortgage claims are missing one or more of the required pieces of documentation for a bankruptcy claim. Furthermore, fees and charges on claims often are poorly identified, making it impossible to verify if such fees are legally permissible or accurate. In nearly all cases [studied], debtors and mortgage companies disagree on the amount of the outstanding mortgage debt.

Porter, *supra* note 2, at 121; *see also*, Hank E. Hildebrand, III, *The Sad State of Mortgage Service Providers*, 22 SEP Am. Bankr. Inst. J. 10 (September 2003) ("mortgage servicers are having a very difficult time dealing with chapter 13"); Deb Miller Testimony before the United States Senate Judiciary Subcommittee on administrative oversight, available at http://judiciary.senate.gov/hearings/testimony.cfm (May 6, 2008) (there are "systemic problems in the mortgage servicing industry").

Despite these known problems, most claims in bankruptcy do not draw an objection. Porter, *supra* note 2, at 168 (the vast majority of all claims (96%) pass undisturbed through the bankruptcy system without objection). Although the consumer debtors' bar should make it a routine part of their representation to scrutinize mortgage claims, the reality is that the typical consumer bankruptcy practitioner deals with extensive information gathering and documentation requirements for very modest compensation; against that busy backdrop few practitioners undertake a careful review of every mortgage claim. *Id.* Those that do often find themselves dealing with initial information from

---

lending and bankruptcy. Katherine Porter, *Misbehavior and Mistake in Bankruptcy Mortgage Claims*, 87 Tex. L. Rev. 121, 140-44 (Jan. 31, 2009).

the mortgage claimant that sometimes appears designed to be deliberately impenetrable.[4] The cryptic presentation of the information by mortgage holders or those charged with servicing the mortgage holders' contract with the mortgagor can have the effect of visiting upon the mortgagor significant cost in getting the most basic information about the mortgage status as perceived by the mortgagee. This may or may not be part of an actual design to discourage mortgagors from asserting their rights. Whether that is an intended consequence of the mortgagee's agent's behavior, it is often the effect of that behavior. In addition, such behavior places significant unwarranted burdens on the limited resources of this Court.

The UST asked the Court to grant injunctive relief requiring (1) that Countrywide's filings be verified by a responsible person and (2) that an auditor be appointed to review the verification process and audit every proof of claim filed by Countrywide in open and pending chapter 13 cases in the Northern District of Ohio at the time of the entry of the order in this adversary proceeding. In addition, the UST requested that Countrywide be required to provide information about its Bankruptcy Ombudsman on all notices transmitted to debtors with respect to the status or payment terms of their residential loan or mortgage and to publish information about its Bankruptcy Ombudsman on its Web site.

Countrywide argued that the relief sought by the UST is unsupported by the record before the Court and beyond the scope of the Court's authority to grant. In addition, Countrywide claimed that its voluntarily implemented measures to improve the accuracy of the information in its filings

---

[4] The Court bases this conclusion on nearly 15 years of handling chapter 13 dockets. I am taking this judicial notice based upon my experiences with the more than 12,700 chapter 13 cases on my docket since Sept. 19, 1994.

are sufficient.

The evidence presented by the UST on the issue of sanctions consisted solely of the opinions of three other courts addressing problems with mortgage servicers and the testimony of John Smith, the representative of Countrywide who testified during the liability phase of trial.[5] The opinions cited by the UST provide minimal assistance to this Court in determining the appropriate sanctions in this case. Two of the opinions address the propriety of monetary sanctions against Countrywide pursuant to § 362(h) and Federal Rule of Bankruptcy Procedure 9011. *See* Exhibits 35 and 36. The third addresses misconduct by a law firm. *See* Exhibit 37.

John Smith testified that Countrywide has made voluntary changes to its practices to improve its handling of loans in bankruptcy. He testified that Countrywide created a "Bankruptcy Ombudsman" office in late 2008 to resolve issues that cannot be resolved by Countrywide's bankruptcy loans/loss mitigation department (the "Bankruptcy Department").[6] Countrywide's

---

[5] The conduct of the plaintiff in this adversary proceeding puzzles the Court. Immediately upon the filing of this litigation in February 2008, an article addressing the activity of the U.S. Trustee program in filing this and two other adversary proceedings in bankruptcy courts in Atlanta and Miami, respectively, appeared in the Wall Street Journal. The Court assumes that article was the result of some form of press release. Initially counsel from the Executive Office of the UST program appeared to be coordinating plaintiff's activities in these three cases.

At the mutual request of the parties, pretrials scheduled in this matter were adjourned several times while the parties purportedly engaged in extensive discovery. In light of such purportedly extensive discovery and "central office" involvement, the Court simply cannot understand the completely truncated case presented by the plaintiff at the remedial phase of this litigation.

[6] According to Mr. Smith's testimony, the Bankruptcy Department consists of approximately 12 individuals nationally.

Bankruptcy Ombudsman office operates separate and apart from the Bankruptcy Department and Mr. Smith's personal knowledge of the Bankruptcy Ombudsman's offices' current practices and procedures was limited. In addition, Mr. Smith testified that he oversaw the creation of "validation teams" whose role was to review proofs of claim after they are prepared but before they are filed. The "validation teams" consist of approximately 40 individuals nationally. Although Mr. Smith helped establish the initial protocols for the "validation teams" and supervised the "validation teams" after their creation, his personal knowledge of their practices and procedures does not extend past mid 2008 when the supervision of the "validation teams" was transferred to someone else in Countrywide's operation.

Mr. Smith also testified that Countrywide has adopted some but not all of the "best practices" suggested by the National Association of Chapter Thirteen Trustees' Mortgage Liaison Committee. These voluntary acts should not be minimized but they are not enough and they have happened far too slowly. For instance, one of the recent improvements touted by Countrywide is the development of a system that purportedly allows Countrywide to accurately apply and track payments in bankruptcy cases. This development is long overdue. For at least the past decade, the inability of mortgage servicers to maintain accurate accounting of payments in bankruptcy situations has been noted as problematic and subjected mortgage servicers to liability. *In re Ronemus*, 201 B.R. 458 (Bankr. N.D. Tex. 1996) (finding the servicer's records wholly incredible); *see also In re Maxwell*, 281 B.R. 101 (Bankr. D. Mass. 2002). Countrywide's actions are perhaps not so "voluntary," but instead are the result of firm warnings from bankruptcy courts throughout the country. In fact, though perhaps Countrywide sees such action as voluntary, this Court wonders why record keeping necessary to the filing of accurate pleadings in bankruptcy cases should ever have been viewed as

optional. Countrywide is reactive rather than proactive with respect to improving its handling of loans in bankruptcy.

I am not the first judge to address Countrywide's systemic problems. In a lengthy opinion from the Southern District of Texas, the bankruptcy court recites facts that bear a strikingly familiar pattern: lack of communication and carelessness leading to errors and unreliable information. *In re Parsley*, 384 B.R. 138 (Bankr. S.D. Tex. 2008). That bankruptcy judge asks "What kind of culture condones blockading personnel from communicating with outside counsel? What kind of culture discourages the checking of outside counsel's work? What kind of culture promotes payment histories that are so confusing to the vast majority of persons...[?]" *Id*. at 184. Despite the detailed picture painted by the bankruptcy court, that court did not affirmatively sanction Countrywide; rather, it admonished Countrywide to improve its procedures. "This Court would hope that this entity would reevaluate its policies and procedures in order to improve upon the accuracy of payment histories and to ensure that its actions do not undermine the integrity of the bankruptcy system." *Id.*

One problem with relying on the mortgage servicing industry to voluntarily improve its practices is the industry's incentive to increase costs. Its interests are not aligned with the borrower, nor even in some circumstances with its investor.[7]

> Mortgage servicers do not have a customer relationship with homeowners; they work for the investors who own the mortgage-backed securities. Borrowers cannot shop for a loan based on the quality of the servicing, and they have virtually no ability to

---

[7] Indeed, as noted in the prior Memorandum Opinion in this case, an apparent driving force in Countrywide's failure to document the satisfaction of Ms. O'Neal's note and to release the mortgage was Countrywide's internal pursuit of its own fees that amounted to 56 % of the short-sale proceeds.

> change servicers if they are dissatisfied with the servicers' conduct. The only exit strategy for a dissatisfied borrower is refinancing the mortgage, and even then, the homeowner may find the new loan assigned to the prior servicer. Because their customers are the trustees who hire them to collect on behalf of investors, servicers have few reputational or financial constraints pushing them to work to satisfy homeowners with their performance.
>
> In fact, servicers have a financial incentive to impose additional fees on consumers. Mortgage servicers earn revenue in three major ways. First, they receive a fixed fee for each loan. Typical arrangements pay servicers between 0.25% and 0.50% of the note principal for each loan. Second, servicers earn "float" income from interest accrued between when consumers pay and when those funds are remitted to investors. Third, servicers often are permitted to retain all, or part, of any default fees, such as late charges, that consumers pay. In this way, a borrower's default can boost a servicer's profits. A significant fraction of servicers' total revenue comes from retained-fee income. Because of this structure, servicers' incentives upon default may not align with investors' incentives. Servicers have incentives to make it difficult for consumers to cure defaults.

Porter, *supra* note 2, at 126-27.

In this case, as set forth more fully in the prior Memorandum Opinion, it is apparent that Countrywide's system for filing proofs of claim was designed to allow each actor in the process to act with indifference to the truth, and to rely solely on the limited information made available at each step. Sanctions are necessary to deter repetition of such conduct or comparable conduct. Fed. R. Bankr. P. 9011(c)(2). "When a court metes out a sanction, it must exercise such power with restraint and discretion. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44, 111 S.Ct. 2123, 2132-33, 115 L.Ed.2d 27 (1991). The sanction levied must thus be commensurate with the egregiousness of the conduct." *Mapother & Mapother, P.S.C. v. Cooper (In re Downs)*, 103 F.3d 472, 478 (6th Cir. 1996). In this case, in order for a sanction to be sufficient it must address not only Countrywide's conduct, but also the lack of resources of debtors' counsel to challenge the claims in many appropriate instances.

I am unconvinced, based on the evidence before me, that Countrywide's voluntarily

implemented "improvements" have sufficiently altered the nature of Countrywide's business model to prevent the same type of error and abuse of process from taking place in other bankruptcy cases. Nor am I persuaded, based on the evidence presented, that the specific sanctions sought by the UST are appropriately granted in this case. The UST failed to show that the cost of putting an auditor in place would be offset by the resulting benefits. The UST failed to show that providing an individual debtor with information about how to reach Countrywide's Bankruptcy Ombudsman would deter Countrywide's future conduct. In essence, the UST's suggested sanctions ignore the judicial setting in which mortgagee's rights are asserted in bankruptcy. What is needed are solutions that invigorate the procedures contemplated by the Bankruptcy Code and Rules, and that nourish the roots of the bankruptcy system, rather than simply propping up the tree. Focus and communication must improve as early as possible in the bankruptcy process. One of the systemic solutions suggested by Professor Porter is to standardize the form of itemization for mortgage claims by requiring claimants to provide as an attachment to the proof of claim details for each claim such as the type of loan, its interest rate and payment adjustment dates.[8] I find this type of solution to be narrowly tailored and likely to prevent the same type of error and abuse of process that took place in this case from taking place in other bankruptcy cases.

Therefore, beginning immediately, Countrywide and its successors and assigns are ordered

---

[8] The Bankruptcy Rules Committee is studying this approach as it considers amending Fed. R. Bankr. P. 3001. At its June 1 and 2, 2009 meeting, the Committee on Rules of Practice and Procedure adopted the recommendations of the Advisory Committee on Bankruptcy Rules and approved publishing for public comment proposed amendments to Rule 3001 prescribing in greater detail the supporting information required to accompany certain proofs of claim. The proposed amendments are expected to be published in August 2009 and will be posted online at www.uscourts.gov/rules.

to complete the attached worksheet (the "Worksheet") for each new proof of claim filed by Countrywide, its successors or assigns before this Court. A copy of the completed Worksheet shall be attached to the proof of claim at the time of filing. In addition, within 75 days from the date of this Order, Countrywide, its successors and assigns are ordered to complete the Worksheet for all previously filed proofs of claim in cases currently pending on this Court's docket and file a copy of the completed Worksheet as a supplement to the previously filed proof of claim. If Countrywide, its successors and assigns fail to use and properly complete the Worksheet in support of their claims, the Court will award monetary sanctions against Countrywide, its successors and/or assigns including, but not limited to, a minimum of $300 for attorney's fees incurred by the debtor or trustee in contesting the claims of Countrywide, its successors and/or assigns, as well as any other compensatory damages that the debtor might prove.

Counsel who seek sanctions against Countrywide, its successors and/or assigns as the result of the failure to use and properly complete the Worksheet should file a motion with the Court and serve the motion on Countrywide, its successors and/or assigns, the Debtor, the Trustee and Dean Wyman of the UST's office for Region 9.

###

cc: Thomas Connop
　　　Robert Folland
　　　Jeremy Campana
　　　Dean Wyman
　　　Paul Randel

08-05031-mss    Doc 98    FILED 07/31/09    ENTERED 07/31/09 15:26:22    Page 10 of 10