UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| COUNTRYWIDE HOMES LOANS, INC., | ) ) ) | CASE NO. 5:09CV2106 |
| APPELLANT, | ) ) | JUDGE SARA LIOI |
| vs. | ) ) | |
| DANIEL C. McDERMOTT, Trustee, | ) ) | **MEMORANDUM OPINION** |
| APPELLEE. | ) ) ) | |

On August 10, 2009, Countrywide Home Loans, Inc. ("Countrywide" or "appellant") timely filed this appeal from the bankruptcy court Memorandum Opinion dated May 1, 2009 (the "Liability Opinion"), the Memorandum Opinion dated July 31, 2009 (the "Remedy Opinion"),[1] and Entry of Judgment of July 31, 2009. Countrywide elected to appeal to this Court and the appeal was docketed here on September 11, 2009. Subsequently, upon appellant's emergency motion,[2] this Court granted a stay of the bankruptcy court's order, pending this appeal. Appellant filed its brief on October 12, 2009. (Doc. No. 11.) Appellee filed its brief on November 12, 2009 (Doc. No. 12), but replaced it with an amended brief on November 17, 2009. (Doc. No. 14.) Appellant filed a reply on November 24, 2009. (Doc. No. 15.) The matter is now ripe for determination.

---

[1] The Remedy Opinion includes an exhibit.

[2] The emergency motion was filed as a miscellaneous case on September 3, 2009, before the instant appeal was filed. *See* Case No. 5:09mc82. That motion was resolved by Memorandum Opinion and Order dated October 7, 2009 (Misc. Case Doc. No. 14), after the Court conducted a hearing on October 1, 2009 (Misc. Case Doc. No. 16).

1

For the reasons set forth below, the bankruptcy court's Liability Opinion dated May 1, 2009 and the Remedy Opinion and Entry of Judgment dated July 31, 2009 are **REVERSED.** This case is **REMANDED** with instructions to enter judgment in the adversary proceeding in favor of defendant-appellant Countrywide and to dismiss the adversary complaint.

## I. BACKGROUND

On May 8, 2004, Marlynn Renee O'Neal ("O'Neal") executed a mortgage and note in the amount of $69,300.00 for the purchase of property in Akron, Ohio. On September 1, 2004, Countrywide began servicing O'Neal's loan and, on April 7, 2005, it filed a complaint to foreclose the mortgage lien against the property. Ultimately, in September 2005, Countrywide accepted a short sale on the property in full satisfaction of the mortgage and note.[3] However, due to clerical errors and mistakes, O'Neal's mortgage account was not properly coded as closed or inactive. Therefore, Countrywide continued to send billing statements to O'Neal, who, beginning about six months after the short sale and continuing through December 2006, repeatedly communicated with Countrywide trying to get the records straight. These efforts were unsuccessful.

---

[3] From Countrywide's recitation of the facts, it appears that O'Neal was the victim of a foreclosure rescue scam. She had approached Jacob Wilhite, a principal of Faith Financial Group of Ohio, LLC, who negotiated the $13,000 short sale with Countrywide. Wilhite represented that he would be the buyer of the property. However, he and O'Neal entered into a Land Trust Agreement, with O'Neal as the beneficiary and Faith Financial as Trustee. Title to O'Neal's property in Akron was conveyed to the Land Trust "for Ten Dollars ($10.00) and other consideration." O'Neal also assigned her beneficial interest in the Land Trust to Faith Financial. The Land Trust then sold the property to Donald Gaines for $70,000. O'Neal signed the deed for the property as "Grantor," even though she no longer held either legal or beneficial title. The sale proceeds were distributed as follows: $15,000 to Faith Financial; $33,333.01 to a company owned by Gaines's brother-in-law; $5,037.50 to the title company; and $13,000 to Countrywide. None of these facts were ever disclosed to Countrywide. (Appellant's Brief, at 3-4.) There is also no indication on this record that any investigation of this scam has been or will be conducted.

2

08-05031-mss    Doc 126    FILED 03/16/10    ENTERED 03/18/10 13:33:17    Page 2 of 20

On April 11, 2007, O'Neal, represented by counsel, filed a Chapter 13 bankruptcy petition. (Bankr. Case No. 07-51027.) She did not schedule Countrywide as a creditor. Because Countrywide's records still incorrectly showed her account as active, on May 1, 2007, Countrywide filed a proof of claim and an objection to confirmation of O'Neal's plan. O'Neal's bankruptcy counsel immediately filed an objection to the proof of claim and a response to Countrywide's confirmation objection. Countrywide did not contest the claim objection and the bankruptcy court entered a default order sustaining the objection on June 6, 2007. On that same day, Countrywide withdrew its objection to confirmation. O'Neal's plan proceeded to confirmation on June 14, 2007. The bankruptcy case was not formally dismissed until February 20, 2009.[4]

On February 28, 2008, the United States Trustee for Region 9 ("UST") filed an adversary proceeding against Countrywide seeking monetary sanctions and an injunction "under 11 U.S.C. § 105(a), Local Bankruptcy Rule 2090-2(c), and under the inherent equitable authority of the Court" to prevent Countrywide from "engaging in bad faith and abusive practices in connection with its preparation, verification, filing and prosecution of pleadings and proofs of claim in bankruptcy cases[.]" (Adv. Proc. No. 08-05031, Doc. No. 1, ¶ 7 and Prayer ¶ b.)[5] The adversary complaint alleged that "Countrywide's failure to ensure the accuracy of its pleadings and accounts in this case is not an isolated incident." (*Id.*, ¶ 26.) The complaint then outlined three cases in other districts where bankruptcy courts sanctioned Countrywide and/or its representatives for abuses within the bankruptcy system. (*Id.*, ¶ 27.)

---

[4] O'Neal passed away in March 2008.

[5] Hereafter, citations to documents in the adversary proceeding will be in the form of "AP Doc. No. --."

Countrywide moved to dismiss the adversary proceeding on the grounds that the court lacked subject matter jurisdiction and the UST lacked standing to file the proceeding.[6] The bankruptcy court denied the motion to dismiss on September 22, 2008 and denied a motion to reconsider on October 27, 2008.

On April 24, 2009, the bankruptcy court conducted the "liability" phase of the trial on the adversary complaint. Based on the evidence admitted and on joint stipulations which had been filed, on May 1, 2009, the court issued its Liability Opinion, including findings of fact and conclusions of law, concluding that "Countrywide's conduct was not reasonable, was reckless and is sanctionable pursuant to § 105 and Rule 9011." (AP Doc. No. 84 at 22.)[7]

The bankruptcy court conducted the "remedial" phase of the trial on May 11 and 12, 2008. At this phase of the trial, over Countrywide's objection, the court admitted into evidence UST Exhibits 34, 36 and 37, orders and opinions from cases in other jurisdictions where monetary sanctions had been imposed on either Countrywide or its counsel,[8] which the UST argued were proof that monetary sanctions against Countrywide would not serve as a deterrent to future wrongful conduct. (*See* 5/11/08 Transcript, AP Doc. No. 95 at 345-49.)

---

[6] A couple days after filing this motion in the bankruptcy court, Countrywide also filed a miscellaneous case in the district court seeking withdrawal of the reference to the bankruptcy court and arguing more or less the same grounds as it had raised in its motion to dismiss. (*See* Case No. 5:08mc43.) On August 20, 2008, Judge Gwin denied the motion to withdraw reference and October 13, 2008, he denied a motion to reconsider that order.

[7] The UST had not sought sanctions under Rule 9011, which requires "notice and a reasonable opportunity to respond" prior to imposition of sanctions.

[8] *In re Mann*, Case No. 03-82973 C-13 (M.D. N.C. March 8, 2004) (UST Exh. 34) (upon debtor's motion for sanctions against Countrywide for violation of automatic stay, the court ordered $11,600 in actual damages and $7,500 in punitive damages); *In re Ennis*, Case No. 05-11985 (W.D. Pa. July 28, 2006) (UST Exh. 36) (for filing an unfounded motion for relief from stay, Countrywide ordered to appear and show cause why it should not be sanctioned in the amount of $1000); and *In re Allen*, Case No. 06-60121 (S.D. Tex. Jan. 9, 2007 and June 18, 2007) (UST Exh. 37) (law firm representing Countrywide sanctioned $75,000 for repeatedly filing "meaningless" documents unsupported by the facts; for causing unnecessary hearings; for needlessly canceling hearings based on misrepresentations to the court; for causing continuances of hearings due to attorney's lack of preparation; and for delaying confirmation of debtor's plan).

On July 31, 2009, the bankruptcy court issued its Remedial Opinion and Entry of Judgment, sanctioning Countrywide as follows:

> Therefore, beginning immediately, Countrywide and its successors and assigns are ordered to complete the attached worksheet (the "Worksheet") for each new proof of claim filed byCountrywide, its successors or assigns before this Court. A copy of the completed Worksheet shall be attached to the proof of claim at the time of filing. In addition, within 75 days from the date of this Order, Countrywide, its successors and assigns are ordered to complete the Worksheet for all previously filed proofs of claim in cases currently pending on this Court's docket and file a copy of the completed Worksheet as a supplement to the previously filed proof of claim. If Countrywide, its successors and assigns fail to use and properly complete the Worksheet in support of their claims,the Court will award monetary sanctions against Countrywide, its successors and/or assigns including, but not limited to, a minimum of $300 for attorney's fees incurred by the debtor or trustee in contesting the claims of Countrywide, its successors and/or assigns, as well as any other compensatory damages that the debtor might prove.

(AP Doc. No. 98 at 9-10.) A Worksheet entitled "Addendum to Proof of Claim" was attached as an exhibit to the Remedy Opinion.[9]

On August 10, 2009, Countrywide timely filed its appeal from both the Liability Opinion and the Remedy Opinion and Entry of Judgment. It also filed a motion for stay pending appeal, which the bankruptcy court denied, although abating the sanction until August 31, 2009. On October 7, 2009, the undersigned granted Countrywide's emergency motion for stay pending appeal filed in this court. (*See* Case No. 5:09mc82, Doc. No. 14.)

## II. DISCUSSION

**A.     Standard of Review**

---

[9] At a hearing on Countrywide's subsequent motion for stay pending appeal, the bankruptcy judge clarified that the requirement to file the Worksheet in all new and pending cases applied only to cases assigned to her docket. (Transcript of 8/25/09 Hearing, AP Doc. No. 115 at 37).

Decisions regarding imposition of sanctions are reviewed for abuse of discretion. *In re Wingerter*, -- F.3d --, No. 08-4455, 2010 WL 252184, at *3 (6th Cir. Jan. 25, 2010) (reversing *In re* Wingerter, 376 B.R. 221 (N.D. Ohio 2007) and 394 B.R. 859, 862 (B.A.P. 6th Cir. 2008), which awarded and affirmed sanctions under Rule 11); *In re Evergreen Sec., Ltd.*, 570 F.3d 1257, 1263 (11th Cir. 2009) (sanctions under 11 U.S.C. § 105). "An abuse of discretion occurs only when the [trial] court relies upon clearly erroneous findings of fact or when it improperly applies the law or uses an erroneous legal standard." *In re Gasel Transp. Lines, Inc.*, 326 B.R. 683, 685 (B.A.P. 6th Cir. 2005). A court also abuses its discretion if the appellate court is left with a "definite and firm conviction that the [bankruptcy court] committed a clear error of judgment." *In re M.J. Waterman & Assocs., Inc.*, 227 F.3d 604, 607-08 (6th Cir. 2000). When reviewing for abuse of discretion, "[t]he question is not how the reviewing court would have ruled, but rather whether a reasonable person could agree with the bankruptcy court's decision; if reasonable persons could differ as to the issue, then there is no abuse of discretion." *In re Eagle-Picher Indus., Inc.*, 285 F.3d 522, 529 (6th Cir.), *cert. denied sub nom Mayor and City Council of Baltimore v. West Virginia*, 537 U.S. 880 (2002).

The bankruptcy court's findings of fact are reviewed for clear error and conclusions of law are reviewed *de novo*. *Hance v. Norfolk Southern Ry. Co.*, 571 F.3d 511, 517 (6th Cir. 2009); *In re United Producers, Inc.*, 526 F.3d 942, 946 (6th Cir. 2008). "A factual determination is clearly erroneous 'when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' " *In re Lebovitz*, 360 B.R. 612 615 (B.A.P. 6th Cir. 2007) (quoting *Bailey v. Bailey (In re Bailey)*, 254 B.R. 901, 903 (B.A.P. 6th Cir. 2000)).

The bankruptcy court's decisions to admit or exclude evidence are reviewed for abuse of discretion. *Id.* (citing *United States v. Humphrey*, 279 F.3d 372, 276 (6th Cir. 2002)). Finally, a court's decision to take judicial notice is also reviewed for abuse of discretion. *American Prairie Const. Co. v. Hoich*, 560 F.3d 780, 796 (8th Cir. 2009). " 'Because the effect of judicial notice is to deprive a party of the opportunity to use rebuttal evidence, cross-examination, and argument to attack contrary evidence, caution must be used in determining that a fact is beyond controversy under [Fed.R.Evid] Rule 201(b).' " *Id.* at 797 (quoting *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 77 (2d Cir. 1998)).

**B.     Analysis**

Countrywide has raised the following issues on appeal:

1.     Whether the bankruptcy court impermissibly amended the local rules as applied to Countrywide outside of the rulemaking process specified in the Federal Rules of Bankruptcy Procedure.

2.     Whether the bankruptcy court had subject matter jurisdiction to adjudicate the adversary proceeding and to enter judgment.

3.     Whether the United States Trustee had the authority or standing to bring the claims asserted in the adversary proceeding.

4.     Whether the record evidence was legally sufficient to support the sanction imposed by the Judgment.

5.     Whether the bankruptcy court's judgment warrants reversal because its injunction was impermissibly vague, because the bankruptcy court relied on sources of evidence

7

outside the record, or because the bankruptcy court improperly admitted Rule 404(b) evidence at trial.

The UST made a counterstatement of the issues as follows:

1. Whether section 105(a) allows a bankruptcy court to prevent abuse by requiring a creditor like Countrywide to submit a Summary with its proof of claim in order to improve communication with local counsel and prevent it from continuing to submit inaccurate filings that increase the burden on debtors and the bankruptcy court system.

2. If so, whether the bankruptcy court abuses its discretion in finding that the record demonstrated systematic weakness in Countrywide's handling of borrowers in bankruptcy that required remedial relief.

The Court finds no merit in any argument that the bankruptcy court lacked subject matter jurisdiction (Issue 2) and/or that the UST lacked authority or standing to bring the adversary proceeding (Issue 3). These matters have already been decided by Judge Gwin in the earlier related miscellaneous case. (*See* Case No. 5:08mc43, Doc. Nos. 9, 15.)

The Court does not reject out of hand appellant's argument that the bankruptcy court's sanction amounted to an improper amendment or revision of the local bankruptcy rules and/or the Official Form 10 used nationwide (Issue 1) or its argument that the sanction was impermissibly vague in several respects (Issue 5). However, the Court need not address these issues because it finds dispositive, as discussed below, the argument that the evidence was legally insufficient to support both the award of sanctions and the particular sanctions imposed (Issue 4).

As a threshold matter, this Court notes that there can be no dispute that bankruptcy courts have both statutory and inherent authority to sanction conduct that abuses the

judicial process. 11 U.S.C. § 105(a). The bankruptcy court's Liability Opinion properly cites numerous cases standing for this proposition. In addition, the bankruptcy court is armed with authority to issue sanctions under Fed. R. Bankr. P. 9011(c) (the counterpart to Fed. R. Civ. P. 11) if, "after notice and a reasonable opportunity to respond," the court determines that an attorney or party has filed pleadings which are not well-grounded in fact or law. *See* Rule 9011(b).

In its Liability Opinion, the bankruptcy court found that "Countrywide's system [of servicing mortgages] is reckless[ ]" and that "[t]he errors in this case were plentiful[.]" It concluded that "[t]he cumulative impact of each of the errors in this case rises to the level of sanctionable conduct in this case." (AP Doc. No. 84 at 21.) The court determined that sanctions were warranted under both Section 105 and Rule 9011.

As already noted, the adversary complaint did not seek sanctions under Rule 9011. Therefore, the bankruptcy court had to have awarded such sanctions on its own initiative.[10] However, Rule 9011 is clear in its requirements with respect to when a court may award sanctions on its own initiative: the court must "enter an order describing the specific conduct that appears to violate [the rule] and directing an attorney, law firm, or party to show cause why it has not violated [the rule] with respect thereto." Bankr.R. 9011(c)(1)(B).

The bankruptcy court's ruling that Rule 9011 had been violated and that sanctions were warranted (i.e., the Liability Opinion) was entered following a trial on the adversary complaint. The bankruptcy court did not enter the requisite show cause order prior to the liability phase of the trial and its resultant ruling. The only order issued with respect to that trial was the

---

[10] Appellant correctly argues that the UST did not seek sanctions under Rule 9011. However, appellant's conclusion that this prohibited the bankruptcy judge from *sua sponte* relying on the rule has no merit.

9

trial order itself and that contained no indication that the bankruptcy court might be considering Rule 9011 sanctions, nor any mention of what conduct the court might consider to be sanctionable. (*See* AP Doc. No. 73.) The mere fact that the UST had sought sanctions under a bankruptcy statute and/or a local bankruptcy rule does not mean that Countrywide was on any kind of notice that the bankruptcy court, on its own initiative, would be considering sanctions on a different basis.

Therefore, to the extent the Liability Opinion determined that sanctions were warranted under Rule 9011, it must be vacated for failure to comply with the requirements of that rule.

The Court turns now to sanctions under 11 U.S.C. § 105.

Strictly speaking, the "errors" committed by Countrywide in the O'Neal bankruptcy case consisted of the filing of *one* proof of claim and *one* objection to confirmation, neither of which was supported by the actual facts. Presumably, the bankruptcy court concluded that the "system" followed by Countrywide was responsible for these two errors and that every mistake along the way added up to sanctionable conduct. This was made clear during closing argument at the remedial phase of the trial when the bankruptcy judge interrupted counsel for the appellant and asked that he "respect the liability opinion that [she] entered[,]" pointing out that there was "not a single error[,]" (as counsel consistently argued) but rather "a parade of errors." (Tr. 5-12-09 at 435 [AP Doc. No. 96 at ECF p. 6].) It is not entirely clear from the Liability Opinion exactly which errors make up the "parade." It could be the various facts set forth in paragraphs 27 and 29-44 of the Liability Opinion, where the court outlined the repeated steps taken by O'Neal to correct her record at Countrywide and Countrywide's ineffective handling of her complaints. The "parade" could also be those matters argued by the UST and reiterated by

the bankruptcy court in the Liability Opinion: "(1) the the filing of a Proof of Claim and Objection To Confirmation of Plan when Countrywide knew that it had accepted a short-sale payoff from Ms. O'Neal in October, 2005; (2) the filing of the Proof of Claim and Objection To Confirmation even though Ms. O'Neal had telephoned Countrywide Home Loan, Inc. repeatedly in 2006 to complain of ongoing receipt of statements showing a growing delinquency after that short sale closing; (3) the filing of the "Proof of Claim and Objection To Confirmation of Plan on behalf of Wells Fargo, N.A. when there had been no assignment of mortgage filed with the Summit County Fiscal Officer of the Mortgage from Ameriquest Mortgage Company to Wells Fargo Bank, N.A. Trustee Wells Fargo Bank, N.A., under that certain Servicing Agreement relating to Park Place Securities, Inc., 2004-MCW1 Asset Back Pass Through Certificates, Series 2004-MCW1 prior to the filing of the Proof of Claim and Objection To Confirmation were filed by Countrywide Home Loans, Inc.; (4) the incorrect statement made by Countrywide Home Loans, Inc. in the Proof of Claim when it stated that all credits had been deducted from the amount it said was owed; and (5) the filing of the satisfaction of Ms. O'Neal's mortgage on or about July 25, 2008 when Countrywide Home Loans, Inc. had accepted the short- sale payoff in October, 2005." (AP Doc. No. 84 at 18.)[11]

No matter how one describes the improper conduct of Countrywide, either as the filing of two improper documents in a single bankruptcy case or as the "parade of errors" identified by both the bankruptcy court and the UST, one cannot escape the fact that these are the

---

[11] The bankruptcy court was also critical of the way that Countrywide communicated with the outside counsel it utilized to make all these filings and with the lack of access to internal documents that such counsel was typically afforded by Countrywide. Ted McClatchey, who filed the proof of claim and the objection to the plan on behalf of Countrywide, testified at the liability phase of the trial that he had done no independent investigation of the facts but merely relied on the information supplied by his paralegal who, in turn, obtained information supplied by Countrywide through a password protected website. (Testimony of Ted McClatchey, AP Doc. No. 93 beginning at ECF p. 99.)

11

only errors supported by the record in this case. In other words, although the record evidence shows that there were many errors made by Countrywide with respect to O'Neal's mortgage which eventually led to its filing of two documents in her bankruptcy case which were not supported by the real facts, neither the liability phase transcript nor the remedy phase transcript supplies any evidence of similar errors in any other bankruptcy case.

Nonetheless, the bankruptcy court concluded, in its Remedy Opinion, that improvements to Countrywide's system were "necessary not just in light of what happened in Ms. O'Neal's bankruptcy case, *but because of the sloppy participation of Countrywide in many chapter 13 cases across the country*." (AP Doc. No. 98 at 2, emphasis added.) In purported support of this broad assertion, the bankruptcy court pointed not to any record evidence but to "respected empirical studies[,]" in particular "The Mortgage Study" reported on by Katherine Porter in *Misbehavior and Mistake in Bankruptcy Mortgage Claims*, 87 Tex. L. Rev. 121, 140-44 (Jan. 31, 2009), which stated that "mortgage companies frequently do not comply with bankruptcy law"; an article by Hank E. Hildebrand III entitled *The Sad State of Mortgage Service Providers*, 22 SEP Am. Bankr. Inst. J. 10 (September 2003), which stated that "mortgage servicers are having a very difficult time dealing with chapter 13"; and testimony given by one Deb Miller before the United States Senate Judiciary Subcommittee on administrative oversight to the effect that there are "systemic problems in the mortgage servicing industry"). (AP Doc. No. 98 at 2-3).

Of course, none of these "experts" were called to testify at the trial and, therefore, these "facts" and conclusions were not the subject of cross-examination.[12] Even so, in reliance on these sources, the bankruptcy court concluded that

> [t]he cryptic presentation of the information by mortgage holders or those charged with servicing the mortgage holders' contract with the mortgagor can have the effect of visiting upon the mortgagor significant cost in getting the most basic information about the mortgage status as perceived by the mortgagee. This may or may not be part of an actual design to discourage mortgagors from asserting their rights. Whether that is an intended consequence of the mortgagee's agent's behavior, it is often the effect of that behavior.

(AP Doc. No. 98 at 4.) The bankruptcy court reached this conclusion despite the fact that the debtor's bankruptcy counsel testified that he had been paid a flat fee of $2,000 to handle the bankruptcy, had not charged the debtor anything additional over the flat fee, had spent only about fifty (50) minutes preparing the objection to proof of claim and the response to the objection to confirmation of the plan, had incurred no additional costs in filing the documents, had not contacted his client prior to filing the documents, and was not aware of any adverse effects suffered by his client as a result of Countrywide's improper filings. (Testimony of Robert M. Whittington, Jr., AP Doc. No. 93 beginning at ECF p. 266.)

The bankruptcy court also relied on its own experience, noting "the problems created by the mortgage servicing industry [which] have been pervasive in many of the cases on this Court's docket[.]" (AP Doc. No. 98 at 2.)[13] However, the record reveals no evidence of other

---

[12] The articles and testimony were also not made part of the record as exhibits. Therefore, appellant had no opportunity to refute them in any way, even though they were eventually treated as having evidentiary value.

[13] The bankruptcy court declared that the rare bankruptcy practitioners who actually attempt to scrutinize mortgage claims "often find themselves dealing with initial information from the mortgage claimant that sometimes appears designed to be deliberately impenetrable." (AP Doc. No. 98 at 4.) In a footnote, the bankruptcy court stated that it was taking "judicial notice" of this fact "based upon my experiences with the more than 12,700 chapter 13 cases on my docket since Sept. 19, 1994." (*Id.*, n.4.) However, this is not the sort of "fact" that is amenable to judicial notice, which is defined as "a court's acceptance, for purposes of convenience and without requiring a party's proof, of a well-known and indisputable fact[.]" BLACK'S LAW DICTIONARY (8th ed. 2004). While this Court does not question

13

cases wherein Countrywide had engaged in behavior similar to its behavior in the O'Neal case. In fact, evidence of other violations was completely lacking and the bankruptcy court itself was critical of the case put on by the UST in support of its request for sanctions, noting that

> [t]he evidence presented by the UST on the issue of sanctions consisted solely of the opinions of three other courts addressing problems with mortgage servicers and the testimony of John Smith, the representative of Countrywide who testified during the liability phase of trial.[5]
>
> [5] The conduct of the plaintiff in this adversary proceeding puzzles the Court. Immediately upon the filing of this litigation in February 2008, an article addressing the activity of the U.S. Trustee program in filing this and two other adversary proceedings in bankruptcy courts in Atlanta and Miami, respectively, appeared in the Wall Street Journal. The Court assumes that article was the result of some form of press release. Initially counsel from the Executive Office of the UST program appeared to be coordinating plaintiff's activities in these three cases.
>
>     At the mutual request of the parties, pretrials scheduled in this matter were adjourned several times while the parties purportedly engaged in extensive discovery. In light of such purportedly extensive discovery and "central office" involvement, the Court simply cannot understand the completely truncated case presented by the plaintiff at the remedial phase of this litigation.

(AP Doc. No. 98 at 5, footnote in original.)[14]

---

the sincerity of this assertion by the bankruptcy court, there is no way for a party to refute such a "fact" set forth for the first time in a written opinion and actually relied upon as one reason for imposing sanctions. Had the bankruptcy court actually provided examples of public record documents supporting her assertions, judicial notice *might* have been appropriate. *See, e.g.*, *In re Cabrera-Mejia*, 402 B.R. 335 (Bankr. C.D.Cal. 2008) (law firm that represented home mortgage creditors engaged in the practice of repeatedly filing, and then withdrawing shortly before or at a hearing on the merits, motions for relief from the automatic stay in some twenty-one (21) Chapter 7 cases involving real estate; following a consolidated show cause hearing in the 21 cases, sanctions were levied against the firm by the bankruptcy court in the amount of $1,000 per motion for a total of $21,000, based on an appendix to the opinion listing each of the cases wherein an improper motion for relief was filed, the identity of the movant, the date of filing, date of hearing and date of order, and the disposition of the motion). Although the court in *Cabrera-Mejia* did not take judicial notice in reaching its decision, this is an example of the kind of public record "facts" where judicial notice might be appropriate. *See also*, *Passa v. City of Columbus*, 123 Fed. Appx. 694, 697 (6th Cir. 2005) (courts permitted to take judicial notice of a public record whose contents prove facts whose accuracy cannot reasonably be questioned).

[14] The "opinions of three other courts" referred to by the bankruptcy judge were admitted over appellant's objection as Plaintiff's Exhibits 34, 36, and 37 (*see*, note 8, *supra*); however, the bankruptcy court did not refer to any of these opinions or rely on any of them in reaching her decision. Instead, she seemed to rely on a different case, not offered into evidence by the UST. She stated:

> I am not the first judge to address Countrywide's systemic problems. In a lengthy opinion from the Southern District of Texas, the bankruptcy court recites facts that bear a strikingly familiar pattern: lack of communication and carelessness leading to errors and unreliable information. *In re Parsley*, 384 B.R. 138 (Bankr. S.D. Tex. 2008). That bankruptcy judge asks "What kind of culture condones blockading personnel from communicating with outside counsel? What kind of culture

14

It is evident from reading the Liability Opinion that, in reliance on "evidence" not in the record, the bankruptcy court became convinced that Countrywide's systemic inefficiencies had caused it to file a proof of claim and an objection to confirmation of plan in the O'Neal case neither of which were supported by the facts. However, the *record evidence* does not support this conclusion and it was an abuse of discretion for the bankruptcy court to hold that the mistaken filing of two documents amounted to sanctionable conduct under Section 105.[15]

Although the Court concludes that the Liability Opinion must be reversed for failure to comply with the requirements of Rule 9011 and for lack of sufficient evidence to support an award under Section 105, the Court will also discuss the remedy itself for purposes of creating a complete opinion.

The UST sought

> injunctive relief requiring (1) that Countrywide's filings be verified by a responsible person and (2) that an auditor be appointed to review the verification process and audit every proof of claim filed by Countrywide in open and pending chapter 13 cases in the Northern District of Ohio at the time of the entry of the order in this adversary proceeding. In addition, the UST requested that Countrywide be required to provide information about its Bankruptcy Ombudsman on all notices transmitted to debtors with respect to the status or payment terms of their residential loan or mortgage and to publish information abouts its Bankruptcy Ombudsman on its Web site.

---

discourages the checking of outside counsel's work? What kind of culture promotes payment histories that are so confusing to the vast majority of persons...[?]" *Id.* at 184. Despite the detailed picture painted by the bankruptcy court, that court did not affirmatively sanction Countrywide; rather, it admonished Countrywide to improve its procedures. "This Court would hope that this entity would reevaluate its policies and procedures in order to improve upon the accuracy of payment histories and to ensure that its actions do not undermine the integrity of the bankruptcy system." *Id.*

AP Doc. No. 98 at 7.

[15] Notwithstanding all the mistakes that were made by Countrywide in their operating procedures, the only two mistakes made in the bankruptcy court itself were the filing of the two unsupported and unsupportable documents. It is inappropriate for a bankruptcy court to sanction anyone for conduct outside the court itself, such as sloppy business practices, without *evidence* to show that these sloppy business practices have broad-ranging effects in the entire bankruptcy court system.

15

(AP Doc. No. 98 at 4.)[16]

---

[16] The UST actually requested much more complex relief. In an exhibit to its Brief for the Remedy Phase (AP Doc. No. 87), the UST proposed the following remedies:

> 1. All proofs of claim filed by Countrywide in the United States Bankruptcy Court for the Northern District of Ohio shall include a detailed itemization of payments and credits as a running account and shall be accompanied by a verified statement from a responsible officer, with access to the entire account history, attesting to the following: (a) Countrywide is a creditor or servicer for a creditor of the debtor with authority to file the claim; (b) Countrywide has audited the debtor's loan history; (c) any alleged pre-petition arrearage is authorized by the operative loan documents and has factual support; and (d) any alleged charges, costs or fees are (i) separately itemized, (ii) authorized by the operative loan documents, (iii) have a basis in fact, and (iv) are reasonable and necessary.
>
> 2. All requests, objections, and pleadings ("Pleadings") filed by Countrywide in the United States Bankruptcy Court for the Northern District of Ohio, including but not limited to motions for relief from stay and objections to confirmation of chapter 13 plans, shall include a verification from a responsible officer, with access to the entire account history, attesting that: (a) Countrywide is a creditor or servicer for a creditor of the debtor with authority to file the Pleading; (b) Countrywide has audited the debtor's loan history; (c) any alleged pre-petition arrearage is authorized by the operative loan documents and has factual support; and (d) the facts set forth in the Pleading are accurate.
>
> 3. The Court shall select and direct appointment of an independent auditor ("Auditor") to be engaged by Countrywide at its own expense. Countrywide will pay all costs arising out of the retention of the Auditor, including compensation and reimbursement of expenses to the Auditor and his/her professionals. With respect to selection, Countrywide will propose to the United States Trustee three qualified candidates to serve as the Auditor, subject to the United States Trustee's right to reject any candidate offered by Countrywide. If candidates are rejected by the United States Trustee, Countrywide will offer qualified replacement candidates to consider. Countrywide and the United States Trustee will propose and consider candidates in good faith. Ultimately, the names of three candidates agreed upon by the United States Trustee and Countrywide will be submitted to the Court, who then will select and approve the Auditor from such list. Each candidate must be a "disinterested person" as that term is defined under 11 U.S.C. § 101(14) and shall not represent an "adverse interest" as determined under the standards applicable to professional persons retained pursuant to 11 U.S.C. § 327(a). The Auditor and any professionals he or she retains will disclose to the Court any connections to Countrywide, its subsidiaries, shareholders, directors, officers, and law firms consistent with 11 U.S.C. § 327(a) and Fed. R. Bankr. P. 2014. The Auditor and his or her firm or employer, including any law partnership or corporation, or accounting partnership or corporation, must agree not to be retained by Countrywide, or its successors or assigns, for a period of one year after the conclusion of the term of this engagement, and any professionals retained by the Auditor also must agree not to be retained by Countrywide, or its successors or assigns, for a period of one year after the conclusion of the term of this engagement, unless the United States Trustee consents to such retention, which consent shall not be unreasonably withheld. The Auditor will cooperate fully with and may communicate with the United States Trustee and any federal, state, or local governmental agency, including responding to reasonable requests for information related to the implementation of and compliance with the terms of this Order, subject to applicable federal and state law.
>
> 4. The Auditor shall perform the following services: (a) supervise and review Countrywide's verification process described in paragraphs 1 and 2 for a period of one year following entry of an order providing for the final resolution of Adversary Proceeding No. 08-5031, or from the date Countrywide retains the Auditor, whichever is longer; and (b) within one year, perform an audit of proofs of claim filed by Countrywide in all open and pending chapter 13 cases in the United States

The bankruptcy court rejected all of these requests because they "ignore the judicial setting in which mortgagee's rights are asserted in bankruptcy." (AP Doc. No. 98 at 9.) The court instead concluded:

> What is needed are solutions that invigorate the procedures contemplated by the Bankruptcy Code and Rules, and that nourish the roots of the bankruptcy system, rather than simply propping up the tree. Focus and communication must improve as early as possible in the bankruptcy process. *One of the systemic solutions suggested by Professor Porter is to standardize the form of itemization for mortgage claims by requiring claimants to provide as an attachment to the proof of claim details for each claim such as the type of loan, its interest rate and payment adjustment dates.*[8] I find this type of solution to be narrowly tailored and

---

Bankruptcy Court for the Northern District of Ohio at the time of the entry of an order providing for the final resolution of Adversary Proceeding No. 08-5031.5. With respect to the audit work provided for under paragraphs 3 and 4, Countrywide will serve the results upon the United States Trustee and will file such report(s) with the United States Bankruptcy Court for the Northern District of Ohio in the underlying case of Ms. O'Neal. Additionally, the Auditor will notify each of the debtors whom the Auditor identified was subject to false, misleading, or impermissible proofs of claim, unless inconsistent with applicable statute, rule, or law in the jurisdiction in which the debtor's bankruptcy case is filed. Such notice will:

    i. include all of the individual's redacted information;

    ii. identify the impermissible nature of the proof of claim; and

    iii. specify whether any money should be returned to the debtor or to the chapter 13 trustee appointed in the debtor's bankruptcy case.

Countrywide shall also notify the chapter 13 trustee appointed in each of the bankruptcy cases filed by the debtors whom the Auditor identified was subject to false, misleading, or impermissible proofs of claim.

6. With regard to cases commenced, and while such cases are pending, in the United States Bankruptcy Court for the Northern District of Ohio, Countrywide shall place information about the Countrywide Bankruptcy Ombudsman, including a telephone number and statement that the debtor or debtor's counsel may telephone the Ombudsman regarding any dispute, concern, or question, on all notices transmitted to debtors with respect to the status or payment terms of their residential loan or mortgage and shall publish prominently information about the Countrywide Bankruptcy Ombudsman on its Web site.

7. The Court shall conduct a status hearing approximately one year from the date of entry of the order imposing these remedies to consider whether Countrywide has improved its practices and whether such remedies should remain in effect.

8. The Order shall be binding on Countrywide and its affiliates and successors and/or assigns, officers, agents, employees, and others to the extent provided in Fed. R. Civ. P. 65(d) and Fed. R. Bankr. P. 7065.

likely to prevent the same type of error and abuse of process that took place in this case from taking place in other bankruptcy cases.

> [8] The Bankruptcy Rules Committee is studying this approach as it considers amending Fed. R. Bankr. P. 3001. At its June 1 and 2, 2009 meeting, the Committee on Rules of Practice and Procedure adopted the recommendations of the Advisory Committee on Bankruptcy Rules and approved publishing for public comment proposed amendments to Rule 3001 prescribing in greater detail the supporting information required to accompany certain proofs of claim. The proposed amendments are expected to be published in August 2009 and will be posted online at www.uscourts.gov/rules.

(AP Doc. No. 98 at 9, footnote in original; emphasis added.)

Instead of imposing any of the sanctions sought by the UST or, *sua sponte*, imposing a monetary sanction, the bankruptcy court instead ordered as follows:

> Therefore, beginning immediately, Countrywide and its successors and assigns are ordered to complete the attached worksheet (the "Worksheet") for each new proof of claim filed by Countrywide, its successors or assigns before this Court. A copy of the completed Worksheet shall be attached to the proof of claim at the time of filing. In addition, within 75 days from the date of this Order, Countrywide, its successors and assigns are ordered to complete the Worksheet for all previously filed proofs of claim in cases currently pending on this Court's docket and file a copy of the completed Worksheet as a supplement to the previously filed proof of claim. If Countrywide, its successors and assigns fail to use and properly complete the Worksheet in support of their claims, the Court will award monetary sanctions against Countrywide, its successors and/or assigns including, but not limited to, a minimum of $300 for attorney's fees incurred by the debtor or trustee in contesting the claims of Countrywide, its successors and/or assigns, as well as any other compensatory damages that the debtor might prove.

(AP Doc. No. 98 at 9-10.)

The bankruptcy court correctly noted that "[w]hen a court metes out a sanction, it must exercise such power with restraint and discretion." (AP Doc. No. 98 at 8, quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991)). It further correctly noted that "[t]he sanction levied must [. . .] be commensurate with the egregiousness of the conduct." (*Id.*, quoting *Mapother & Mapother, P.S.C. v. Cooper (In re Downs)*, 103 F.3d 472, 478 (6th Cir. 1996)).

There is evidence in this case to support a finding of *two* arguably knowing, reckless actions in a *single bankruptcy case* (probably caused by a string of sloppy internal procedures at Countrywide), but no *actual evidence* of similar behavior by Countrywide in any other case. Even so, the bankruptcy court, relying on her own experience of which she improperly took "judicial notice," law review articles referring to problems in the mortgage industry generally, and one case from another court outlining a problem with Countrywide specifically (a case which was also not a part of the record), imposed a sweeping sanction in the form of an injunction requiring Countrywide, and only Countrywide (not other mortgage servicers) to file a particular worksheet in all new cases and to go back and file the same worksheet in all cases pending before this bankruptcy judge. This sanction does not reflect "restraint" and is not "commensurate with the egregiousness of the [proven] conduct."

This Court has no doubt, after reading the entire record, that the bankruptcy judge is genuinely frustrated with what she perceives as a systemic problem in the entire mortgage servicing industry.[17] However, this was an adversary proceeding and, in that context, sanctions must be supportable by the record evidence and imposed with "restraint and discretion." *Chambers*, 501 U.S. at 44. Unfortunately, as even the bankruptcy court itself noted, the UST put

---

[17] The bankruptcy court noted, for example, that "[o]ne problem with relying on the *mortgage servicing industry* to voluntarily improve its practices is the industry's incentive to increase costs." (AP Doc. No. 98 at 7, emphasis added.) She pointed to the fact that, in the instant case, "an apparent driving force in Countrywide's failure to document the satisfaction of Ms. O'Neal's note and to release the mortgage was Countrywide's internal pursuit of its own fees that amounted to 56% of the short-sale proceeds." (*Id*. n.7.) However, the sanction imposed here was on *one* mortgage servicer, not the whole industry, and, therefore, holds out little hope of really solving purported system-wide problems.

This Court doubts that there would be anything prohibiting the bankruptcy judges of the Northern District of Ohio from proposing to the district court an amendment to the local bankruptcy rules which would require anyone filing a proof of claim to also submit the "worksheet" which had been imposed as a sanction in this case. An alternative would be for the bankruptcy judges to propose an amendment to Official Form 10 (an avenue which is apparently already under consideration at the national level). Taking either route would require significant discussion and consensus among the bankruptcy judges *and* an opportunity for public comment before the worksheet would be imposed district-wide or nationwide. That would be a much fairer and more effective procedure than simply imposing it on *one* mortgage servicer for cases on *one* bankruptcy judge's docket in *one* district court.

on a "truncated case" and simply did not supply proof sufficient to support either liability or the sanctions created and imposed by the bankruptcy court.

### III. CONCLUSION

For the reasons set forth herein, the bankruptcy court's Liability Opinion dated May 1, 2009 (AP Doc. No. 85) and the Remedy Opinion and Entry of Judgment dated July 31, 2009 (AP Doc. Nos. 98 and 99) are **REVERSED**. This case is **REMANDED** with instructions to enter judgment in the adversary proceeding in favor of defendant-appellant Countrywide and to dismiss the adversary complaint.

**IT IS SO ORDERED**.

Dated: March 16, 2010

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**